# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) Plaintiff, ) | Case No. 2:05-cr-00182-KJD-PAL |
| vs. ) | **REPORT OF** |
| BERNARDO HERNANDEZ-TORRES, ) | **FINDINGS AND RECOMMENDATION** |
| ) Defendant. ) | (M/Suppress - #13) |

This matter was referred to the undersigned for findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4 on defendant Hernandez-Torres' ("Hernandez") Motion to Suppress Evidence for Fourth Amendment Violation (#13).  The court has considered the motion, the government's Response (#15), defendant's Reply (#16), and the testimony adduced at an evidentiary hearing conducted December 1, 2005.

## BACKGROUND

Defendant is charged in an indictment returned May 18, 2005 with possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(A)(ii).  The indictment arises out of a traffic stop and ensuing arrest on April 28, 2005 by a Nevada Highway Patrol trooper, who is a member of the Southern Nevada Interdiction Task Force.  Hernandez seeks to suppress evidence recovered in a search of the 1991 Infiniti Q-45 automobile he was driving at the time of his arrest, asserting the government cannot meet its burden of establishing that his warrantless seizure was sufficiently limited in scope and duration, or that he freely and voluntarily consented to a search of the vehicle. Specifically, Hernandez argues that (1) the traffic stop was not based on probable cause and, therefore, unlawful; (2) the officer did not have reasonable suspicion to believe that he was engaged in criminal activity and he was, therefore, detained without reasonable suspicion; (3) assuming *arguendo* that the

initial stop was constitutionally permissible, the scope of the detention was not tailored to its initial justification and lasted longer than necessary to effectuate the purpose of the stop; (4) the scope of questioning during the initial stop and detention was too broad and unrelated to the purpose of the traffic stop; (5) his written consent was tainted by prior Fourth Amendment violations; and (6) his consent was involuntarily obtained through duress and coercion. He therefore seeks to suppress the tangible and testimonial evidence derived from the stop, seizure, and arrest under the "fruit of the poisonous tree" doctrine.

The government opposes the motion, asserting that (1) Hernandez was lawfully stopped for speeding; (2) he was properly detained during investigation of the traffic stop; (3) the officers obtained Hernandez' consent in a consensual encounter; (4) the officers had reasonable suspicion to detain Hernandez and ask him questions about drug activity; and (5) Hernandez voluntarily consented to a search of his car.

At the evidentiary hearing, the government called two witnesses and rested. Hernandez elected not to adduce any testimony or evidence.

**Testimony of Eddie Dutchover**

Dutchover has been a trooper with the Nevada Highway Patrol ("NHP") for approximately six years, and has been assigned to the Southern Nevada Interdiction Task Force ("SNITF") for approximately three years. Part of his routine duties involve patrolling Interstate 15. He has patrolled the area north of Las Vegas between Mile Markers 50 and 55 for approximately four years. He was not on duty on April 28, 2005 when Hernandez was stopped and eventually arrested, and was not involved in this traffic stop or arrest.

On April 28, 2005, the speed limit between Mile Markers 50 and 54 was fifty-five miles per hour. This was a period of heavy construction involving replacement of an overpass on-ramp and off-ramp. Signs were posted, indicating that the speed limit was fifty-five miles per hour due to construction. There were two orange signs at Craig Road just before the overpass at approximately Mile Marker 48 or 49, indicating the area was a construction zone and two white speed limit signs indicating the speed limit was fifty-five miles per hour. Outside of the construction zone, the speed limit on I-15 is sixty-five miles per hour or higher. The sixty-five mile per hour speed limit signs were

1 covered over or changed during the construction and not visible to motorists.  The construction ended
2 just north of I-215, the new beltway, at approximately Mile Marker 54.  In May and April of 2005, there
3 were no signs that indicated the speed limit was sixty-five miles per hour between approximately Mile
4 Marker 48 and 49 and Mile Marker 54.

5      On cross-examination, Dutchover acknowledged that the speed limit went from sixty-five to
6 seventy-five a short distance from the end of the construction zone.  The construction was concentrated
7 on the overpass road improvement at Craig Road to I-215.  Two orange signs just before the overpass
8 read "Reduced Speed Ahead" and "Construction Zone – Double Penalty."  There were two additional
9 white DOT fifty-five mile per hour speed limit signs also posted in this area.  In April and May of 2005,
10 the NHP was doing speeding enforcement in this area due to several complaints of speeding in
11 construction zones.

12      On redirect examination, Dutchover testified that although his primary role as a member of the
13 task force is drug interdiction, he routinely performs traffic enforcement duties as well.

14 **Testimony of Trooper Matt Moonin**

15      Moonin has been employed by the NHP for approximately eight years, and assigned to the
16 SNITF for approximately one year.  His duties involve urban traffic control in the Las Vegas
17 metropolitan area and during the course of his employment, he has routinely patrolled the area north of
18 Las Vegas between Mile Markers 50 and 55.  On April 28, 2005, he was parked in his patrol car at
19 approximately Mile Marker 48 near Craig Road and the Speedway off the shoulder of I-15.  The Las
20 Vegas Speedway exit, No. 54, is located at Mile Marker 54.  I-15 is south of the Speedway at
21 approximately Mile Marker 52.  He was on patrol at 1:06 a.m. on April 28, 2005 when he observed a
22 1991 Infiniti pass northbound on I-15.  He visually estimated the speed in excess of the posted fifty-five
23 mile per hour speed limit and confirmed it with his radar device.  The vehicle was traveling sixty-seven
24 miles per hour, according to his mounted radar unit.  He pulled into the traffic lane and followed.  The
25 speed limit in this area is normally sixty-five miles per hour.  However, this was a period of heavy
26 construction, and the speed was reduced to fifty-five miles per hour approximately a mile and a half to
27 two miles on both sides of the construction zone.
28 / / /

1    On April 28, 2005, there were signs at both ends of the construction zone.  There were white
2 signs indicating the speed limit was reduced to fifty-five miles per hour, and orange signs indicating the
3 area was a construction zone.  The sixty-five mile per hour signs were covered over within the
4 construction zone and only the fifty-five mile per hour and construction signs were visible to passing
5 motorists.
6    After the Infiniti passed him, he checked for traffic, pulled out behind and followed it in the
7 number two lane until he pulled the driver over at approximately Mile Marker 53.  Moonin paced the
8 driver of the Infiniti still traveling at approximately sixty-seven miles per hour and pulled him over just
9 as he had passed a seventy-five mile per hour sign.  On the date of the stop, Moonin believed that the
10 speed limit changed from fifty-five miles per hour to seventy-five miles per hour at approximately Mile
11 Marker 52 or 53, approximately a quarter mile after the end of the construction zone.  From where he
12 was stopped prior to pulling the Infiniti over, the seventy-five mile per hour sign was not visible to
13 passing motorists in the construction zone because it was obstructed by a dirt hill associated with the
14 construction.
15    He pulled the Infiniti over, using his overhead emergency lights and siren.  The Infiniti slowed
16 and pulled over to the right of the road and was stopped at 1:06 a.m.  He approached the vehicle on the
17 driver's side and observed one occupant, whom he identified in open court as the defendant, in the
18 driver's seat.  He asked Hernandez for his driver's license and registration.  As he approached the car,
19 he noticed Hernandez light a cigarette and testified that Hernandez smoked nervously and quickly.
20 Hernandez' right hand was noticeably shaking, he was inhaling and taking deep drags on his cigarette
21 and rapidly burning the cigarette down.  As he made contact with Hernandez, Moonin also noticed that
22 Hernandez was breathing heavily, taking deep, fast breaths and that his chest was visibly moving in and
23 out which was another indication of nervousness.  As Hernandez presented his driver's license and
24 registration, his hands were shaking moderately.  The driver's license and registration were in
25 Hernandez' name and indicated he lived in San Diego.
26    After receiving the driver's license and registration, Moonin returned to his patrol vehicle to
27 conduct a records check.  Hernandez was told when he was pulled over that he was stopped for
28 speeding, for driving sixty-seven miles per hour.  Hernandez said he was traveling sixty-seven which

1   was only a little over sixty-five miles per hour. Moonin advised him that he had driven through a
2   construction zone where the speed limit was reduced to fifty-five miles per hour. Before conducting the
3   records check, Moonin noted a strong odor of air freshener, more than usual for a vehicle with an air
4   freshener. He also noticed that the air freshener was attached to the emergency brake pedal. He
5   observed multiple food wrappers within the interior of the vehicle and a black suitcase on the back seat.
6   He also noticed that Hernandez was watching the northbound traffic lane during their encounter.

7          His duty as an interdiction officer is to control or reduce the flow of all illegal activity, including
8   narcotics. He has attended several schools and had hundreds of hours of training and experience in
9   drug trafficking interdiction and is familiar with identifying concealment techniques, methods of
10  transporting controlled substances, transportation routes, and signs of individuals who may be
11  trafficking in narcotics. He estimated that he had conducted thirty to forty interdiction stops in his
12  career, and that he had assisted in over one hundred such stops.

13         Common indicators or signs he has been trained to recognize as potential indicators of drug
14  trafficking activity include a strong odor of air freshener, which is commonly used to mask the odor of
15  narcotics. Based on his training and experience, a lot of drug smugglers believe air fresheners can mask
16  the odor and fool drug-sniffing dogs. Other indicators include the presence of fast food wrappers which
17  are indicative of someone making a long trip, not making frequent stops, and trying to get from one city
18  to another as fast as possible. In his experience, drug traffickers tend to make long trips to get drugs
19  from a source city to the destination city, and attempt to do so as quickly as possible to limit contact
20  with law enforcement. He also observed a large atlas in the interior of Hernandez' vehicle which is
21  consistent with drug couriers who take long trips, and want to insure they are taking the correct road.
22  The presence of the black suitcase in the back seat of the car was also suspicious to Moonin, because in
23  his experience people normally store their luggage in their trunk.

24         Moonin's initial contact with Hernandez lasted approximately three to four minutes from the
25  stop until the time he went back to his patrol car to give dispatch the information and request a records
26  check. It is a standard operating procedure of the NHP to conduct a records check on all traffic stops.
27  Normally, records checks take five to fifteen minutes for results to be reported, depending on how busy
28  the dispatch center is. Moonin received the results of Hernandez' records check a little quicker than

1  usual.  While waiting for the records check, Moonin walked back to the defendant and engaged him in
2  general conversation.  He asked Hernandez where he was going, and Hernandez responded that he was
3  traveling to "Salt City."  Moonin asked if Hernandez meant Salt Lake City, and Hernandez seemed
4  surprised but answered, "Yes, Salt Lake City," indicating he was going there to see what it looked like.
5  Moonin asked where he was coming from, and Hernandez responded, "From San Diego."  Moonin
6  asked him if he was going to see anyone in Salt Lake City, and Hernandez answered, "A friend."

7  When Moonin asked who the friend was, Hernandez stopped Moonin, interrupted him, and
8  stated, "I need to tell you something."  Hernandez reached out and touched Moonin's right elbow and
9  said, "I'm gay."  Moonin testified that he was caught by surprise by this but told Hernandez that that
10 had no bearing on the stop.  Hernandez stepped back and stated in a surprised tone, "That doesn't
11 bother you?" and Moonin responded, "No, not at all."  Moonin believed that Hernandez' remark was an
12 attempt to evoke a stereo-typical reaction, or a tactic to get him to change his thought process and to
13 limit contact with Hernandez.  Moonin went on to ask Hernandez if the car belonged to him.
14 Hernandez responded the car was his and that he had purchased it approximately two months prior, and
15 believed he paid approximately a thousand dollars for it but was not sure.  Moonin found this statement
16 odd, because Hernandez was not sure what he paid for the car, and Moonin felt that a thousand dollars
17 was a low purchase price for a Q-45 automobile.  Moonin asked Hernandez why he was driving so late
18 at night, and Hernandez responded that he liked to drive at night because there were less cars at night
19 and added in a joking tone, "There's less police."  All of these questions are the type of general
20 questions most NHP troopers ask during routine traffic stops.  Moonin again asked the name of
21 Hernandez' friend in Salt Lake City.  Hernandez said he only knew his first name, Carlos, although he
22 had known him for approximately seven years.

23 The conversation between Moonin and Hernandez occurred outside of Hernandez' vehicle.
24 When Moonin returned after calling in the information to dispatch, he asked Hernandez to get out of the
25 car and stay out of the lane of coming traffic.  On approaching the car the second time, Moonin noticed
26 one key in the ignition on a key ring with no other keys.  This was another suspicious indicator that
27 Hernandez was involved in drug trafficking.  In his experience, having a single key on a ring is
28 ///

1  common when a car is used for only one purpose.  For example, NHP troopers have a single key on a
2  key ring for their patrol cars.
3         Hernandez' demeanor was more nervous than usual throughout the entire encounter.  Although
4  it is common for people to be nervous when they are pulled over in traffic stops, the degree of
5  nervousness usually tapers off and people calm down.  However, Hernandez appeared extremely
6  nervous.  He shifted his weight back and forth from one foot to another and appeared unable to stand
7  still.  He also folded and unfolded his arms repeatedly, scraped his foot on the asphalt, and was
8  sweating heavily although it was chilly outside.  Moonin observed beads of sweat from the temple to
9  the hair line area.  As a result, Moonin asked Hernandez if he was okay a couple of times, and
10 Hernandez responded, "Yes," as he wiped sweat from his face.
11        Dispatch reported the results of the records check at approximately 1:20 a.m.  Moonin stepped
12 back to the right passenger door of the patrol car to get the report from dispatch.  Dispatch reported
13 Hernandez had several traffic violations, and several narcotics violations in his criminal history, but no
14 outstanding warrants.  After receiving the records report, he decided to issue Hernandez a warning for
15 speeding.  However, prior to returning to Hernandez' vehicle to give him the warning, he had already
16 completed a consent to search form.  Moonin walked back to Hernandez' vehicle, handed back his
17 paperwork, gave him a verbal warning, and told Hernandez, "You are free to leave."  Hernandez
18 smiled, turned and started to walk away toward his car.  Moonin then asked if he could ask Hernandez
19 additional questions.  Hernandez turned, smiled, said, "Yes," or "Sure," and walked toward Moonin.
20        Moonin testified that throughout their encounter, Hernandez had no difficulty at all in
21 communicating.  Hernandez spoke very good English, always responded appropriately to questions, and
22 never said he did not understand anything, or ask for questions to be repeated.  Moonin also observed
23 that Hernandez used English slang which indicated a facility with the English language.
24        After Hernandez indicated he would answer additional questions, Moonin asked him if he had
25 anything illegal such as weapons or contraband in the car.  Hernandez responded, "No, that was a long
26 time ago."  Hernandez' response heightened Moonin's suspicions.  Moonin then asked if he had any
27 narcotics, specifically, marijuana which Hernandez denied.  He then asked if Hernandez had any
28 methamphetamine which he denied, and finally, whether he had any cocaine.  When asked if he had any

1  cocaine, Hernandez bowed his head, looked at the ground, and said no. Moonin also asked if he had
2  any weapons which Hernandez denied. Moonin then asked if Hernandez would consent to a search of
3  the car. Hernandez nodded his head, indicated yes verbally, and made a gesture of his hand toward the
4  car. After Moonin received Hernandez' verbal consent, he pulled out the written consent to search form
5  which he had previously partially filled out and asked Hernandez to read and sign it if he agreed.

6  Before asking him to read and sign the form, Moonin asked Hernandez if he read English, and
7  Hernandez said he did. Moonin also asked whether he was more comfortable with English or Spanish,
8  and Hernandez responded, "English is good." He handed Hernandez the form containing two parts, one
9  in English and one in Spanish and watched as Hernandez appeared to read the form, observing him
10 using his finger to follow the text. Hernandez took Moonin's pen, looked at his watch, noted the time,
11 and placed the time 1:17 a.m. on the form, signed it, and handed it back to Moonin. Moonin testified
12 he told Hernandez to make sure that he read and understood the form, and asked him if he did to which
13 Hernandez responded, "Yes." The NHP consent to search form was marked and admitted as
14 Government's Exhibit "1" at the hearing. Moonin was the only officer at the scene at the time he
15 requested the consent. He had not drawn his gun, or placed his hand on his gun. Moonin did not
16 administer *Miranda* warnings because Hernandez was free to leave, and Moonin considered this a
17 consensual encounter. He did not tell Hernandez that if Hernandez failed to consent, he would get a
18 search warrant for the vehicle. Hernandez' movements were not restricted during the encounter. He
19 was free to stand wherever he wanted, except that Moonin told him to stay out of the travel lane.

20 Moonin began the search by conducting a hand search starting in the trunk of the vehicle and
21 looking for common areas where drugs are concealed. He proceeded systematically from the rear of the
22 vehicle forward. Another trooper arrived after he received Hernandez' verbal and written consent.
23 After pulling Hernandez over, he asked dispatch to send another unit to the scene because he was alone,
24 it was 1:00 a.m., and Hernandez was so nervous. Under these circumstances, it is standard procedure to
25 request a backup officer in both interdiction cases and ordinary traffic stops. He requested the backup
26 officer after the records check was requested. Among other reasons, he requested backup because he
27 noted Hernandez watching the cars passing by. From his training and experience, he knows that drug
28 smugglers sometimes use a following vehicle to make sure that the vehicle containing the contraband

gets to its destination and head off trouble.  He also requested backup because he has had a number of people he has stopped attempt to run from a traffic stop.

After searching the front of the vehicle, he attempted to lift the hood, because the engine area of the car is a common area where drugs can be concealed.  He had trouble finding the latch for this model of vehicle and while placing his hand under the bumper for balance while trying to locate the latch, he felt something unusual.  In examining the area, he could see a portion of the bumper had been cut out and immediately recognized it, based on his training and experience, as a hidden compartment.  He observed that the screws on the license plate had score marks, indicating they had been removed a number of times.  Moonin examined the bracket bolts which were also scored, indicating an unusual amount of wear.  He removed the bracket screws and saw that a portion of the bumper was cut out and bolted to the bracket.  He also saw a door to the cutout which was covered by rust.  The cutout and door were not consistent with a normal auto bumper.  There were two hinges on the door, and it was secured by a screw.  He lifted up the door and saw several packages in clear plastic wrapping consistent with the manner in which narcotics are transported.  They appeared to be kilos or brick-shaped packages.

After seeing the suspected narcotics, he turned to Hernandez who was standing approximately five feet away, told him to turn around, and that he was under arrest for suspicion of possession of controlled substances.  In response, Hernandez blurted out, "That cocaine's not mine.  It's not mine."  At the time Hernandez made this utterance, Moonin did not know what the suspected controlled substance that he had discovered was.  At no point while he was searching the vehicle did Hernandez ask Moonin to stop the search, ask to leave, drive away, or terminate his encounter with Officer Moonin.  Hernandez was placed under arrest at 2:09 a.m.

On cross-examination, Moonin testified that at the time of this stop, he had been on the interdiction squad for approximately six months.  Prior to joining NHP, he was a university police officer whose duties included traffic enforcement.  In his seven years with NHP, he has enforced traffic regulations within the State of Nevada, primarily in the Las Vegas metropolitan area.  He is currently assigned to an interdiction task force, but is still a state trooper responsible for traffic enforcement, including writing speeding tickets and responding to accidents.

///

1    On April 28, 2005, he was parked at approximately Mile Marker 51 on the right shoulder of the
2 road, pointed northbound when he first observed Hernandez in the Infiniti. Traffic was light to
3 moderate at that time of the morning, and there were no other cars around Hernandez when his radar
4 locked on the Infiniti.

5    Moonin normally works alone in a one-man unit, and on this night he was the last interdiction
6 team member out that night. The NHP Computer Automated Dispatch report ("CAD") was marked and
7 admitted as defendant's Exhibit "A." This is a report generated by the dispatch center. He attempts to
8 synchronize his watch and the watch in his patrol cruiser to the same time as dispatch so the times of
9 the events are as consistent as possible. He recalled that Hernandez' watch was not set to the same time
10 and was approximately five minutes slower. The CAD report reflects the traffic stop was conducted at
11 1:06:47 a.m., and that he called in Hernandez' personal information requesting a records check at
12 1:08:14 a.m. Dispatch provided the return information at 1:20 a.m. Moonin sent a code to dispatch at
13 1:12:26 a.m., indicating he was all right, and requested a backup unit at 1:12:43 a.m.

14    His purpose in engaging Hernandez in conversation while waiting for the records check was to
15 give the appearance that he was more of a friendly person and testified that most cops do so for the
16 same reason and to fill the time while waiting for the results. He acknowledged that he initiated the
17 conversation with Hernandez, and that Hernandez responded. Engaging a person in conversation in this
18 manner is consistent with his training and a normal part of his duties. He reiterated that he believed
19 Hernandez spoke fluent English during the encounter although he acknowledged Hernandez seemed to
20 speak with a Hispanic accent. He is taught to make reports as factual as possible and to note important
21 factors. However, he did not indicate in his report that Hernandez spoke fluent English with a slight
22 accent.

23    Government's Exhibit "1," the NHP consent to search form, is written in both English and
24 Spanish for various reasons. In his experience, some people understand English and can read or write
25 English, others can speak English but cannot read or write in the English language. Hernandez
26 specifically said he could read English.

27    When Hernandez interrupted Moonin's questioning, saying, "I need to tell you something," he
28 repeated it in a "building tone." Moonin knows gay people, and understands gay people are

1  discriminated against.  When Hernandez made the comment that he was gay, Moonin took it as an
2  attempt to provoke a reaction from Moonin, not to avoid being discriminated against.
3       Moonin filled out a portion of a consent to search form prior to receiving the records results
4  from dispatch.  Trooper Howell arrived after Moonin had started searching the car.  Hernandez signed
5  the consent to search form at 1:22 a.m. according to Moonin's watch and dispatch records.  He
6  reiterated that Hernandez placed the time 1:17 a.m. on the form after looking at his own watch which
7  did not tell the same time.  He did not know which backup officer would be sent to his location.
8  Trooper Howell arrived at 1:33:03 a.m. according to the CAD report.  Moonin was beginning to search
9  the interior of the vehicle when Howell showed up.
10       On redirect examination, Moonin testified that San Diego is a widely known source city for
11  narcotics, and that Salt Lake City is a widely known user city for narcotics.  He, therefore, found the
12  fact that Hernandez was traveling from San Diego to Salt Lake City suspicious.

## DISCUSSION

14       The Fourth Amendment secures "the right of the people to be secure in their persons,
15  houses, papers, and effects against unreasonable searches and seizures."  U.S. Const. amend. IV.  The
16  Fourth Amendment protects reasonable and legitimate expectations of privacy.  Katz v. United States,
17  389 U.S. 347 (1967).  The Fourth Amendment protects "people not places."  Id.  Evidence obtained in
18  violation of the Fourth Amendment, and evidence derived from it may be suppressed as the "fruit of the
19  poisonous tree."  Wong Sun v. United States, 371 U.S. 471 (1963).

20  **A.**   **The Traffic Stop**

21      A traffic stop is seizure for purposes of the Fourth Amendment.  For Fourth Amendment
22  purposes, the seizure of a person occurs when a law enforcement officer in some way restricts the
23  liberty of a citizen, either by physical force or show of authority.  Florida v. Bostick, 501 U.S. 429, 434
24  (1991).  A citizen's liberty is restrained if, "taking into account all of the circumstances surrounding the
25  encounter, the police conduct would 'have communicated to a reasonable person that he was not at
26  liberty to ignore the police presence and go about his business.'"  Id. at 437, quoting, California v.
27  Hodari D., 499 U.S. 621, 628 (1991).  The reasonable person test is an objective one and "presupposes
28  / / /


an *innocent* person." United States v. Drayton, 536 U.S. 194, 202 (2002), quoting, Bostick at 437-38 (emphasis in original).

Even a brief, temporary detention in a traffic stop constitutes a seizure for purposes of the Fourth Amendment. See Delaware v. Prouse, 440 U.S. 648, 653 (1979); United States v. Martinez-Fuerte, 428 U.S. 543 (1976); United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975); United States v. Garcia, 205 F.3d 1182, 1187 (9th Cir. 2000). Hernandez was clearly not free to ignore the police presence and go about his business while Moonin detained him, requested his identification and registration, and initially questioned him. He was, therefore, seized for purposes of Fourth Amendment analysis.

A decision to stop an automobile is reasonable where the police have probable cause to believe a traffic violation has occurred. Whren v. United States, 517 U.S. 806, 810 (1996). As long as the officer had probable cause to conduct a traffic stop for a traffic violation, the fact that the officer stopping the vehicle was a member of a drug interdiction squad and may have also suspected Hernandez was transporting drugs, does not render the stop invalid for Fourth Amendment purposes. This is because the Supreme Court has made it clear that "[S]ubjective intentions play no role in ordinary, probable-cause, Fourth Amendment analysis." Id. at 813. Hernandez was observed traveling sixty-seven miles per hour in a fifty-five mile per hour construction zone. Hernandez acknowledged he was traveling sixty-seven miles per hour, but told Moonin he believed the speed limit was sixty-five miles per hour rather than fifty-five. The court finds the initial traffic stop was based on probable cause, and, therefore, reasonable within the meaning of the Fourth Amendment.

**B.     Scope of the Traffic Stop**

Hernandez argues that the scope of his detention was not justified by the traffic stop because Moonin's questioning of him was not limited to questions reasonably related to the traffic violation. The Supreme Court has held that police contact during an investigatory detention must be reasonably related to the circumstances that initially justified the detention. United States v. Sharpe, 470 U.S. 675, 682 (1985). The court has also held that "[T]he length and scope of detention must be justified by the circumstances authorizing its initiation." Pierce v. Multnomah County, 76 F.3d 1032, 1038 (9th Cir. 1996), citing, Terry v. Ohio, 392 U.S. 1, 16, 19 (1968). "Thus, when an officer has obtained sufficient

12

information to issue a citation, a continued detention without probable cause to arrest for a crime is unreasonable." Id., citing, United States v. Luckett, 484 F.2d 89, 90-91 (9th Cir. 1973) (*per curiam*); McKenzie v. Lamb, 738 F.2d 1005, 1008 (9th Cir. 1984); and United States v. Jennings, 468 F.2d 111, 115 (9th Cir. 1972).

Hernandez' written motion asserts that Trooper Moonin engaged Hernandez in several minutes of conversation before returning to his patrol to request a records check. However, Trooper Moonin testified that his initial encounter with Hernandez in which he advised Hernandez why he was being pulled over, and requested driver's license and registration information lasted three to four minutes at most. The CAD report reflects that Hernandez was pulled over at 1:06:47 a.m. and that Moonin requested that dispatch conduct a records check at 1:08:14 a.m., less than two minutes after the stop. The majority of the conversation between Moonin and Hernandez occurred between 1:08 a.m. and 1:20 a.m. when dispatch reported the results of its records check to Moonin by radio.

Hernandez relies on the Ninth Circuit decision in United States v. Chavez-Valenzuela, which held that the scope of an investigative detention must be carefully tailored to its underlying justification, and may last no longer than necessary to effectuate the purpose of the stop. 268 F.3d 719, 724 (9th Cir. 2001), amended by, 279 F.3d 1062 (2002) (quoting Florida v. Royer, 460 U.S. 491, 500 (1983). Hernandez argues that his initial detention was not conducted in good faith and that the scope of the stop was not "carefully tailored" to the purpose for the stop. The court has found the officer had probable cause to stop Hernandez for speeding. With respect to Hernandez' contention that his initial detention was not conducted in good faith, he seems to argue that this was an impermissible pretext stop. However, the Supreme Court has made it clear that as long as an officer has probable cause to conduct a stop for a traffic violation, the fact that he also suspected Hernandez was transporting drugs does not render the stop invalid for Fourth Amendment purposes.

The court found the testimony of Trooper Moonin credible that the questions he asked and responses he elicited from Hernandez was done while he was awaiting a records check, which is routinely ordered in every traffic stop. Thus, contrary to Hernandez' arguments, the detention lasted no longer than necessary to effectuate the purpose of the stop. Once Moonin confirmed from police dispatch that there were no outstanding wants or warrants, he returned Hernandez' driver's license and

registration to him, issued him a verbal warning, and told him he was free to leave. The court found this testimony credible.

Hernandez also argues that the scope of his detention was unreasonable because Moonin's questioning was not limited to the purpose of the initial stop, i.e., the traffic stop for speeding. The Supreme Court has held that questioning must relate to the purpose of the stop. United States v. Brignone-Ponce, 422 U.S. 873, 881 (1975). However, once questioning begins, "[a]n officer may broaden his or her line of questioning if he or she notices additional suspicious factors," so long as these factors are particularized and objective. United States v. Perez, 37 F.3d 510, 514 (9th Cir. 1994). Here, Moonin articulated a number of factors which made him suspicious of Hernandez. Hernandez was extremely nervous throughout the encounter, more so than the typical motorist pulled over in a traffic stop. His hands visibly shook. He was taking deep, long drags on his cigarette, burning it down more rapidly than usual. He was taking deep breaths to the extent his chest was moving in and out throughout the encounter, and he was sweating profusely although it was chilly outside. There was a strong, overwhelming odor of air freshener emanating from the car, which is indicative, based on his training and experience, of an attempt to mask an odor of a controlled substance. There were multiple food wrappers throughout the interior of the vehicle and a large atlas in the car which, based on his training and experience, are indicators of possible drug smuggling activity. He also found the suitcase in the backseat suspicious because most people store their luggage in the trunk. Hernandez initially said he was enroute to "Salt City" to see the city, then later to visit a friend he had known for seven years, yet only knew his first name. Hernandez also told Moonin he bought a luxury automobile, albeit one that was fourteen years old, approximately two months earlier and believed he paid $1,000 for it. The court finds, under the totality of the circumstances, that Moonin's questioning was based on his reasonable suspicion, based on the particularized and objective factors he articulated on the record. Hernandez was not asked whether he had any weapons or contraband in the car until after his driver's license and registration were returned, he was verbally warned, and told he was free to leave. The court, therefore, finds that the scope of his traffic stop was appropriately limited to the circumstances related to its initiation, and that Hernandez was asked a moderate number of questions suggested by the suspicious factors Moonin observed.

1   The court also found Trooper Moonin credible that after he returned Hernandez' documents and
2   told him he was free to leave, Hernandez turned, started to walk back toward his vehicle, and that
3   Moonin then asked whether Hernandez would answer some additional questions. Moonin was credible
4   that Hernandez turned around, indicated he was willing to answer additional questions, and began to
5   walk back toward Moonin. The court finds Hernandez was, indeed, free to leave and that he consented
6   to speak with Moonin after being asked. His encounter with Moonin from the point he agreed to speak
7   further was consensual.

8   **C.   Consent**

9   A search conducted without a warrant does not offend the Constitution "if conducted pursuant
10  to the valid consent of the person in control of the premises." United States v. Kaplan, 895 F.2d 618,
11  622 (9th Cir. 1990). It is the government's burden to demonstrate that consent to a warrantless search
12  was voluntary. Id. Whether the consent to search was voluntary and intelligent is question of fact, and
13  its resolution depends upon the totality of the circumstances. United States v. Morning, 64 F.3d 531,
14  533 (9th Cir. 1995). The Ninth Circuit considers five factors in determining whether a person freely
15  consented to a search: (1) whether the defendant was in custody; (2) whether the arresting officers had
16  their guns drawn; (3) whether *Miranda* warnings were given; (4) whether the defendant was told he had
17  a right not to consent; and (5) whether the defendant was told that a search warrant could be obtained.
18  Id. When reviewing the surrounding circumstances, however, "there is no single controlling criterion."
19  Kaplan, 895 F.2d at 622, quoting, United States v. Agosto, 502 F.2d 612, 614 (9th Cir. 1974) (*per*
20  *curiam*). These five factors are only guideposts, not a mechanized formula to resolve the voluntariness
21  inquiry. United States v. Soriano, 346 F.3d 963 (9th Cir. 2003), citing, Schneckloth v. Bustamonte,
22  412 U.S. 218, 224 (1997). No one factor is determinative. United States v. Castillo, 866 F.2d 1071,
23  1082 (9th Cir. 1989). As the Ninth Circuit observed in Morning, "[E]very encounter has its own facts
24  and its own dynamics. So does every consent." 64 F.3d at 533.

25  Here, it is undisputed that Hernandez signed a written consent to search the vehicle. The court
26  found Moonin's testimony credible that Hernandez spoke fluent English, indicated he read and
27  understood English, and appeared to read the form as Moonin observed. Hernandez took Moonin's
28  pen, looked at his own watch and noted the time, and inserted the time on the form before signing the

1  consent. At the time he signed the consent, he was not in custody. Moonin did not draw his weapon or
2  place his hand on his weapon at any point during the encounter. Moonin did not advise Hernandez of
3  his *Miranda* rights. However, the Supreme Court has held that because ordinary traffic stops are
4  noncoercive, persons temporarily detained in traffic stops are not "in custody" for purposes of *Miranda*.
5  Berkemer v. McCarty, 468 U.S. 420, 439 (1984). Thus, *Miranda* warnings were not required.
6  Hernandez was not told he had the right to refuse to consent or that if he refused to consent, a search
7  warrant could be obtained. Viewing the totality of the circumstances, the court finds Hernandez
8  consented to speak with Moonin and that his consent to search the car was voluntarily given.

9        **D.**     **Fruit of the Poisonous Tree Doctrine**

10  Hernandez argues that although he had not been formally arrested, he had been detained for an
11  unreasonable period of time and subjected to "fishing expedition" questions that implied the trooper
12  suspected him of criminal activity. However, from the evidence adduced at the evidentiary hearing, it is
13  clear Moonin asked him a number of questions concerning his starting point, destination, and general
14  travel plans without suggesting or implying Hernandez was engaged in criminal activity. Only after
15  Hernandez was told he was free to leave, began to leave, and then agreed to speak with Moonin, were
16  any questions asked about drugs, weapons, or contraband. No Fourth Amendment violation preceded
17  these additional questions, or the request to consent to a search of the vehicle. Therefore, the "fruit of
18  the poisonous tree" doctrine does not apply.

19            **CONCLUSION**

20  Hernandez was pulled over on probable cause to believe he was speeding. The traffic stop was
21  appropriately limited in scope and duration to the purpose which initially justified the stop. While
22  waiting for dispatch to run a check for outstanding wants and warrants, Moonin asked Hernandez a
23  number of questions concerning his starting point, destination, and purpose of travel which were
24  reasonable given the particularized and objective reasons Moonin articulated on the record for being
25  suspicious of Hernandez. After Moonin returned Hernandez' driver's license and registration, gave
26  Hernandez a verbal warning and told Hernandez he was free to leave, Hernandez was, in fact, free to
27  leave and began to leave. The court found Trooper Moonin credible that after Hernandez began to
28  leave, Moonin requested permission to speak with him further, and that Hernandez agreed. From this

point until Hernandez was placed under arrest after the drugs were found, the encounter between Moonin and Hernandez was consensual.  Applying the five factors articulated by the Ninth Circuit, the court finds, under the totality of the circumstances, that Hernandez consented to speak with the officer and that his written consent to search the car was voluntarily given.

For all of the foregoing reasons,

**IT IS THE RECOMMENDATION** of the undersigned United States Magistrate Judge that Hernandez' Motion to Suppress (#13) be DENIED.

Dated this 20th day of December, 2005.

_____
PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE